Warren H. **RUSHTON** and David L. Lostroh, Appellants,

v.

**NEBRASKA PUBLIC POWER DISTRICT,** Don E. Schaufelberger, and Lawrence G. Kuncl, Appellees.

No. 87–1441.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 17, 1987.

Decided April 14, 1988.

Rehearing and Rehearing En Banc Denied June 14, 1988.

No appearance made for appellants.

Frederick Kauffman, Lincoln, Neb., for appellees.

Before ARNOLD and FAGG, Circuit Judges, and LARSON,* Senior District Judge.

ARNOLD, Circuit Judge.

Appellants Rushton and Lostroh brought this § 1983 action when they lost their jobs with the Nebraska Public Power District for refusing to undergo urinalysis. After a seven-day trial, the District Court held against them. *Rushton v. Nebraska Pub-*

*lic Power Dist.*, 653 F.Supp. 1510 (D.Neb. 1987). Now Rushton and Lostroh appeal, arguing that their First, Fourth, Fifth, Ninth, and Fourteenth Amendment rights were violated by the Nebraska Public Power District's drug-testing policy. We affirm the judgment of the District Court.[1]

I.

The Nebraska Public Power District (NPPD) is a public corporation and political subdivision of the state. It owns Cooper Nuclear Station (CNS), a nuclear power plant located at Brownsville, Nebraska. Cooper Nuclear Station, like all nuclear power plants, is heavily regulated by the Nuclear Regulatory Commission. See 10 CFR parts 0–199. The NRC maintains resident inspectors at CNS and periodically sends teams to review the plant's security. Access to the plant is restricted. The protected area of the plant is completely surrounded by a fence. To enter the protected area, a person must go through explosive and metal detectors, and submit to random pat downs by guards. Identification must be presented to the guards, and a badge issued. Though subject to observation by guards once inside the protected area, a person is also free to move about unescorted.[2]

The NPPD adopted its drug-testing program, the Fitness for Duty Program, in response to a number of developments. First was issuance by the NRC of a rule requiring adoption of such a plan in 1982. See 47 Fed.Reg. 33,980.[3] Second was a report by the NRC of a rise in drug-related accidents at nuclear power plants. Indeed, the NRC had received a report of alcohol

---

* The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Hon. Warren K. Urbom, United States District Judge for the District of Nebraska.

2. Inside the protected area, the area within the fence surrounding the plant, are so-called "vital areas," which contain equipment necessary to prevent or mitigate the effects of a radiological release. Guards are not posted at the entrances

to vital areas, nor is entry restricted by a turnstyle. Access to the vital areas is gained via a card reader. The card reader opens a door, potentially allowing more than one person to pass. Employees are on their honor not to enter the vital areas on another person's card.

3. This order was withdrawn in 1986 because of the industry's widespread implementation of fitness for duty plans. See 51 Fed.Reg. 27,872. The NRC continues to monitor the efficacy of these programs, however. *Id.*

use on the premises by guards at CNS.[4] Finally, at the time of the issuance of the NRC rule and the report of impaired guards, CNS was temporarily shut down. The plant's managers feared CNS would not be allowed to reopen absent assurance that the personnel were drug-free.

Thus, in 1985 CNS adopted its first Fitness for Duty Program, requiring testing of all employees with access to protected areas of the plant. The plan called for preemployment, pretransfer, annual, and for-cause testing. If a positive result was obtained, the employee was given a chance to appeal and to take a second confirmation test. A drug- or alcohol-abusing employee was given the choice of undergoing counseling through NPPD's Employee Assistance Program or being disciplined and perhaps discharged. The plan was later modified to include random testing and to improve chain-of-custody precautions.

Appellants Dave Lostroh and Warren Rushton were engineers at CNS. Most of the time they worked at the NPPD office in Columbus, Nebraska. However, both had unescorted access to protected areas of the plant, and visited CNS 6–7 hours per month. When the first Fitness for Duty Plan was implemented, Lostroh and Rushton refused to comply, arguing that the plan violated their constitutional rights. After a series of meetings with CNS management, no solution could be worked out, and the two men were fired. Their termination led to the present litigation.

## II.

Appellants' first argument is a novel one. They contend that their First Amendment right to free exercise of religion was violated by the drug-testing program. Appellants do not object to urinalysis per se, but rather to a statement of policy in the Employee Assistance Program and incorporated by reference in the Fitness for Duty Program: "alcoholism is recognized as an illness for which there is effective treatment and rehabilitation."

Rushton and Lostroh are conservative Christians who believe alcoholism is a sin, not an illness. Further, they believe they must separate themselves from heretical doctrines, such as the notion that alcoholism is a disease. By complying with the program, Rushton and Lostroh claim they would be giving their tacit support to a heretical idea. Thus, they argue they must be exempted from the plan to preserve their right of free exercise.

The First Amendment guarantees a person free exercise of his chosen religion. However, an individual does not have an absolute right to practice his religion as he pleases. The Supreme Court has developed a three-part test for determining whether a governmental regulation impermissibly burdens an individual's religious practices. First, we must ask whether the regulation burdens, directly or indirectly, the plaintiff's religious practice. *United States v. Lee,* 455 U.S. 252, 256–58, 102 S.Ct. 1051, 1054–55, 71 L.Ed.2d 127 (1982). If the religious practice is burdened, the state may justify a limitation on that practice if it can show an "overriding governmental interest." *Id.* Finally, even if the state can show a compelling state interest necessitating the regulation, it must also show that it has chosen the least restrictive means of achieving its objective. *Thomas v. Review Board,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).

The District Court found that appellants' religious beliefs were sincere, and that their religious practices were burdened by NPPD's Fitness for Duty Program. On appeal the NPPD vigorously contests these determinations. We have no reason to question the finding of plaintiffs' sincerity. As to whether their religious freedom was actually burdened, we express no view, because the burden, if any, was amply justified under prevailing legal principles.

The District Court described two overriding state interests: the health and safety of the public and NPPD employees and the economic interest of ratepayers. The

---

**4.** When the plan at CNS was instituted, two guards tested positive for drugs. One claimed the positive result was caused by medication. He was retested and the second test came out negative. The other guard quit before a second test could be performed.

former is obvious. A radiological release could seriously injure the public and the plant employees. The second harm could occur whenever there was some malfunction, whether involving release of radiation or damage to equipment. The cost of repair would be passed on to the ratepayers.

Appellants do not contest that the state's interests are compelling.[5] Instead they assert that the inquiry should be drawn more narrowly: we shouldn't ask what general risks are associated with accidents at nuclear power plants, but what problems could occur if appellants were impaired by drugs. After all, they are not asking that the entire drug testing program be struck down, only that they be exempted from it. Cf. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Appellants note that there are numerous backup systems to prevent a release of radiation, so that it would be exceedingly difficult for a drug-impaired person to cause an accident. In addition, appellants remind us that they are seldom in the power plant, and that their jobs do not require quick reflexes or snap decisions. Appellants contend that they could do little damage even if they were drug-impaired.

We do not find appellants' contentions persuasive. Perhaps CNS was designed to withstand an impaired operator. This does not make superfluous the addition of new measures to make the plant even safer. Surely the update and reevaluation of safety concerns should not end because the plant was considered to be safe initially. Also, while it may be true that appellants spend little time at CNS, and the possibility of their causing a release of radiation while drug-impaired is small, it does not follow that the men could do no damage if they were using drugs. The District Court noted that "operators must remain aware and observant and must react promptly and accurately to mitigate damages resulting from an accident, maloperation, or sabotage." 653 F.Supp. at 1520. If impaired, appellants might violate a safety regulation, deliberately or through inadvertence, and thus make containment of an accident more difficult. In addition, drug use might cause an accident of lesser magnitude than the radiological release appellants describe. They might cause a fellow employee to be injured in a way not involving a release of radiation—a mundane industrial accident— or they might break machinery that would be extremely expensive to repair.[6]

Appellants also argue that less restrictive alternatives to their participation in the drug-testing program existed. They propose that they could sign an affidavit of non-use of drugs and undergo an extensive background check, or be escorted into protected areas. They suggest returning to the first plan, which did not require random testing.[7] Finally, they propose that the policy statement in the Employee Assistance Program be amended, removing or modifying the offending language.[8]

---

5. We therefore need not decide whether economic loss to ratepayers would of itself justify a burden on religious freedom. And even if it would not, the danger of catastrophic loss of health and life is so great, in the context of this case, that this factor alone sufficiently supports whatever intrusion on religious freedom is occurring here.

6. By bumping into an instrument rack or turning a valve improperly, they might "scram" the reactor, a mistake of inattention that would cost $500,000—$600,000 a day to repair. Transcript at 383.

7. Lostroh testified that he found for-cause testing less objectionable, since it did not offend his Fourth Amendment rights, but he still believed it clashed with his religious beliefs. Transcript at 97. We do not understand why this is offered as a less restrictive alternative.

8. In their briefs appellants suggest adding the following paragraphs to the Employee Assistance Program statement of policy:

While the above paragraphs describe the policy and philosophy of the rehabilitation program regularly used by NPPD, NPPD recognizes that some persons and religious groups hold a different view of drug and alcohol abuse. Some such persons and groups regard drug and alcohol abuse as a sin rather than as an illness and therefore do not accept the above-outlined policy and philosophy for its cure. To accommodate such persons and groups, NPPD will consider allowing employees who have tested positive to present alternative plans for treatment, including but not limited to treatment programs run by religious groups. After the employee has completed such treatment, however, NPPD reserves the right to pass final judgment upon whether or not the employee is truly

We agree with the District Court that NPPD's drug-testing program is the least restrictive method of assuring the safe operation of the power plant. An affidavit cannot provide convincing proof that an employee is drug free. There was expert testimony at trial that a drug abuser would do just about anything to avoid detection. Transcript at 653. Such a person could easily lie in his affidavit. Other employees, with religious beliefs less sincere than those of appellants, could try to claim a religious exemption. The idea of an extensive background check was not raised at trial. In any case, unless the employee were constantly monitored, there is no reason to believe a background check would conclusively rule out drug use. Indeed, such an intrusion might be more offensive than urinalysis. Escorted access, besides being an inefficient use of personnel, would also provide inadequate assurance. The guard/escort might not be able to detect subtle behavioral differences, especially if he saw his charges only a few times a month.

We believe appellants' final proposal, that the policy language be changed, might be efficacious. If Lostroh and Rushton would submit to the testing program once the statement was amended, then adequate assurance of non-use of drugs would be provided. However, this solution was not offered until the trial was over, appellants had lost their jobs, and the case was on appeal. We decline to consider a less-restrictive-alternative argument that was not presented to the District Court, especially since plaintiffs advance no reason for this procedural lapse. NPPD may of course voluntarily amend its policy statement if it wishes to do so.

### III.

■■■ Rushton and Lostroh next argue that their Fourth Amendment right to be free of unreasonable search and seizure was violated. Urinalysis is a search for purposes of the Fourth Amendment.

*McDonell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987); *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986). That established, we must ask whether the search is reasonable. Determination of the reasonableness of a search depends on the context in which a search takes place, and requires a balancing of the individual's legitimate expectation of privacy and personal security against the government's need for the search. See *New Jersey v. TLO,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985).

The state's interest in conducting this search and why the plan was implemented have already been discussed in detail. The potential for harm is vast, and the abuse of alcohol and use of illegal drugs are widespread in this country. What remains to be explored is the individual's expectation of privacy. Appellants assert they have a privacy expectation in the act of urination and in the information which testing of the urine would reveal. To be sure, appellants have an interest in urinating in private. However, the NPPD plan does not require that someone witness the employee urinate. Thus, the plan does not burden this interest. It is also true that some potentially embarrassing personal information can be obtained via urinalysis; for example, the test would reveal the presence of diabetes and pregnancy, and of antiepileptic and antidepression medication.

In response to these concerns we note first that appellants' expectation of privacy was already significantly diminished by virtue of working at CNS. The nuclear industry is heavily regulated. Access to the plant is carefully controlled. Once inside, people are subject to observation. Thus, we believe the District Court was correct in holding that the facts of this case place it squarely within the administrative-search exception articulated in *Shoemaker v. Handel,* 795 F.2d 1136, 1142 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). We further point out that "[w]hile the fourth amendment pro-

---

drug/alcohol free, before restoring him to his position and/or giving him unescorted access to vital areas.

Brief of Appellants, pp. 22–23.

tects against invasions for civil as well as criminal investigative purposes, the need for protection against governmental intrusions diminishes if the investigation is neither designed to enforce criminal laws nor likely to be used to bring criminal charges against the person being investigated." *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 179 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); see also *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987). In this case, the results of urinalysis are being used solely to determine a person's fitness for work; they are not turned over to the police.

Appellants argue that drug testing should not be allowed in the absence of individualized suspicion. See *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986); *Lovvorn v. Chattanooga*, 647 F.Supp. 875 (E.D.Tenn.1986). However, "[w]hile 'some quantum of individualized suspicion is usually a prerequisite to a constitutional search ... the fourth amendment imposes no irreducible requirement of such suspicion.'" *Von Raab, supra,* at 176 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)). The determination of whether or not individualized suspicion will be required before drug testing is allowed must be made with reference to the circumstances of each case. It is a factor to be weighed when balancing the state and private interests. In this case, where the state interest is so great and the private interest so diminished, we hold individualized suspicion is not required.[9]

We recognize that in *Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575 (9th Cir.1988), a divided panel of the Ninth Circuit held invalid under the Fourth Amendment a regulation of the Federal Railroad Administration requiring testing of all railroad employees involved in certain kinds of accidents. The case may be distinguishable on the basis of the far greater

potential for harm that could be caused by a malfunction of a nuclear power plant. In any event, to the extent that the reasoning and holding of the Ninth Circuit diverge from those expressed in this opinion, we respectfully disagree with that Court.

### IV.

Plaintiffs also advance arguments under the Fifth, Ninth, and Fourteenth Amendments. These contentions are thoroughly addressed in the District Court's careful opinion. We reject them for substantially the same reasons given by Judge Urbom.

Affirmed.

---

9. We also observe that the Fourth Amendment, unlike the First Amendment, does not require the government to choose the least intrusive method. *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987) (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983)).