Brian D. ENSOR, Plaintiff,

v.

The RUST ENGINEERING
COMPANY, Defendant.

No. 3–88–894.

United States District Court,
E.D. Tennessee, N.D.

Jan. 11, 1989.

James A.H. Bell, Knoxville, Tenn., for plaintiff.

E.H. Rayson, Knoxville, Tenn., for defendant.

## MEMORANDUM OPINION

JARVIS, District Judge.

This is an action for declaratory relief, injunctive relief and damages brought by plaintiff Brian D. Ensor against his employer, The Rust Engineering Company ("Rust"). Plaintiff contends that Rust violated his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution as well as under Article 1, Sections 7 and 8, of Tennessee Constitution, by suspending him and threatening him with termination for his failure to submit to a mandatory urinalysis as part of a recently founded drug-testing program. Since most of the historical facts in this case are undisputed, the parties have by agreement submitted this matter to the court for decision based upon two depositions which have been taken for proof, various exhibits attached thereto, and certain stipulations which the parties have entered into.

The parties have stipulated the following:

The parties have chosen not to litigate the questions of the sample's change of custody, the reliability of a laboratory's test, and the confidentiality of test results.

The parties agree that they desire a determination as to whether Rust's drug testing program is reasonable under the Fourth Amendment without reaching the question of whether Rust's drug testing

program at DOE's Oak Ridge facility consists [sic] federal government action for constitutional purposes. The parties recognize that this Amendment shall not constitute an admission of government action in this or any other proceeding.

Based on these stipulations, the fundamental question for this court is whether Rust's mandatory drug testing program is reasonable under the Fourth Amendment to the United States Constitution.[1] The following constitutes this court's findings of fact and conclusions of law in conformity with Rule 52(a), Federal Rules of Civil Procedure.

### I.

*Plaintiff's Objections to Portions of the Deposition Testimony of John J. Eckerle, Jr.*

Since the evidence in this case is presented via depositions taken for proof, the parties reserved their objections for ruling by this court. Plaintiff's counsel objected to portions of Mr. Eckerle's testimony given in response to questions regarding possible catastrophic harm or danger which might be caused by an impaired Rust employee, testimony given in response to questions regarding potential duties which Mr. Ensor or another Rust pipefitter might perform at the Y–12 facility, and testimony given in response to questions concerning the position which the plaintiff's union took with respect to the reasonableness of the drug policy.

Plaintiff objects to the above evidence on grounds of relevance, Rule 401, Federal Rules of Evidence, and on grounds that the evidence is unduly prejudicial, Rule 403, Federal Rules of Evidence. The court has reviewed the testimony and exhibits objected to and in each case finds the evidence to be relevant. Evidence concerning the potential safety hazards that might be caused by an impaired Rust pipefitter and the po-

---

1. The court notes that whether or not governmental action exists is often a preliminary issue in a civil rights case. However, the parties have by agreement requested the court to assume for purposes of this case that Rust is a government actor and the court is of the opinion that it would be appropriate to do so. *See Public Utili-* *ties Commission v. Pollak,* 343 U.S. 451, 462–63, 72 S.Ct. 813, 820–21, 96 L.Ed. 1068 (1952); *Ripon Society v. National Republican Party,* 525 F.2d 567, 578 n. 28 (D.C.Cir.1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

tential assignments which plaintiff might be given in his position as a pipefitter are both highly relevant with regard to the reasonableness of the Rust drug testing program.

The position taken by plaintiff's union is not determinative on the issue of reasonableness and is of slight probative value, but it has some relevance on the question of the reasonableness. Nor do I find that the probative value of any of this evidence is substantially outweighed by any danger of unfair prejudice, confusion or any of the other factors listed under Rule 403, Federal Rules of Evidence. Accordingly, plaintiff's objections to the testimony of Mr. Eckerle and to the exhibits attached to his deposition are overruled.

## II.

### Factual Background

The United States Government operates a facility in Oak Ridge, Tennessee engaged in research in the field of nuclear energy and also in the manufacture, fabrication and assembly of nuclear weapons components. The facility contains three primary plants: (1) the X–10 Plant; (2) the K–25 Plant (or Oak Ridge Gaseous Diffusion Plant); and (3) the Y–12 Plant. Research, development, fabrication and assembly of nuclear weapons components, including components containing fissionable material, takes place at the Y–12 Plant. Rust is a construction contractor performing construction and maintenance work at Oak Ridge under contract with the United States Department of Energy. Rust's primary work site, and the primary work site of plaintiff Brian D. Ensor, is at the Y–12 Plant.

As might be expected, the entire Oak Ridge facility is heavily fortified and guarded and the safety and security precautions taken by the Government are rigorous. Access to and movement within the facilities are restricted and monitored both by direct visual observation and camera. The operating contractor, Martin Marietta Energy Systems, directs a heavily armed, uniformed guard force which patrols the facility, as well as a combat response team to deal with safety and security threats.

The Y–12 Plant itself consists of multiple buildings on a large tract of land. Access to different areas is controlled by several different degrees of security. "Uncleared" areas are accessible to anyone who has been permitted to enter the Oak Ridge facility at the primary access point. No security clearance is required to enter the uncleared areas. Entry into "secured" areas requires an individual to have a "Q" clearance from the Department of Energy or be escorted by a Q-cleared individual. Access to "protected areas" is more restricted and only Q-cleared individuals may enter absent extraordinary circumstances. "Protected" areas are enclosed in double or triple concentric fences with barbed wire and a "no-man's land" between the wires. Within the protected areas are the most highly secured areas known as "Material Accountability Access Areas" ("MAA Areas"). It is in these MAA areas that fissionable nuclear materials are handled. Access to the MAA areas is restricted to Q-cleared individuals who have received specialized training about the processes that are being carried on and safety and security concerns of that particular area.

There are multiple security checks and screening points throughout the protected areas at Y–12. Automobiles entering the areas are regularly searched, as are tool boxes and other containers.

Rust's construction employees working in the secured and protected areas are required to possess a DOE Q-clearance. To obtain the Q-clearance, the individual must complete a detailed questionnaire disclosing a variety of personal associations and habits and he must undergo a thorough background investigation. The background investigation and questionnaire inquire into, among other things, the potential employee's use or possession of illegal drugs.

The defendant contends that safety, particularly because of the presence of fissionable materials, and national security are paramount concerns of Rust at Oak Ridge.

Obviously, these are legitimate concerns, and the court so finds.

Plaintiff Brian Ensor is employed as a pipefitter by Rust primarily at the Y–12 Plant since May, 1985. He is a member of the Plumbers and Steamfitters Local Union # 102. Ensor first received a Q-clearance almost 10 years ago in order to work as a pipefitter for Rust during an earlier term of employment. His Q-clearance permits him unsupervised access to secured and protected areas of the Y–12 facility. Ensor cannot freely enter the MAA areas where the fissionable materials are located. However, with a specialized orientation, he could be provided access to an MAA area for work on a particular project. Although plaintiff is by trade a journeyman pipefitter, his day-to-day work over the past two years has consisted primarily of that of a delivery person delivering requisitioned materials from a company warehouse to locations inside the protected areas. A driver accompanies plaintiff when these deliveries are made. Plaintiff's work also includes the loading and unloading, by hand or machine, of the requisitioned parts.

Occasionally plaintiff is assigned by his foreman to perform the work of a traditional pipefitter and could potentially be assigned such work at any time by his foreman. When plaintiff performs as a delivery person, he is also responsible for the rigging of heavy parts and equipment for cranes to move.

In April, 1986, Rust began to negotiate with its employees collective bargaining agent, The Knoxville Building Trades Council ("KBTC"), over a program and procedures for drug testing of all Rust employees at the Oak Ridge facility. Ensor's union, Local # 102, participated in these negotiations.

Defendant contends that it became interested in a drug testing program for its employees because it discovered marijuana in the possession of one of its pipefitters on the site in December, 1984, because of awareness of the growing incidence of illegal drug usage in the general population, and because of the severe safety and national security concerns which such illegal drug usage could cause if carried on by a Rust employee at the Oak Ridge site.

Defendant contends that this concern extends to use or possession of illegal drugs both on-site and off-site. Defendant argues that off-site use could impair performance on-site, and off-site use or possession could subject the employee to extortion or lead to other breaches of national security. The court finds that the concerns expressed by defendant are legitimate and not pretextual.

In June, 1987, Rust implemented the negotiated drug testing policy as a safety and security rule. Four of the labor unions of Rust employees, including Local # 102, filed a grievance challenging Rust's decision to implement the policy as a safety and security rule rather than including the policy in the next collective bargaining agreement. The grievance was arbitrated before Arbitrator C. Allen Foster, and at the arbitration the unions formally stipulated that the testing policy in question was reasonable. On February 15, 1988, the arbitrator upheld Rust's right to implement the policy as a safety and security rule and specifically found that it was a reasonable one under the circumstances. *See* Exhibits H, L and M attached to Eckerle deposition.

The negotiated drug testing policy contained, *inter alia*, the following provision for employee testing:

> *Employee Testing:* Within a six (6) month period of time, beginning on the implementation date of this program, all employees will be selected for drug testing. The names and/or numbers will be selected in an unbiased manner by computer and scheduled accordingly. Refusal of any individual to submit to drug testing will result in an automatic 30–day suspension from the site without pay. A drug test must be performed before reinstatement of employment; continued refusal will subject employee to termination and denial of access to the job site.

> Employees who test negative will not be subjected to further testing for 90 days, except for cause as stated under Abnormal Behavior Testing. After that

time their names will be included in a Periodic Employee Testing Program which will insure retesting at least once during each individual's 36–month retest cycle.

*Abnormal Behavior Testing:* Any employee who demonstrates signs of abnormal behavior (unusual mental responses, unusual physical function, emotional instability, etc.) is to be reported to their principal supervisor, additionally, employees may be investigated in connection with safety or security incidents. The principal supervisor and the designated drug abuse coordinator will determine if drug testing and/or other action is appropriate on a case-by-case basis. Supervision will be trained to detect abnormal behavior.

*Disciplinary Actions:* An employee who tests positive for drug use will be suspended from the site without pay for 30 days. At the end of the suspension period, if work for the employee is still available, another test will be performed. If this test is negative, the employee will be returned to work.

An employee who tests positive will be counseled and encouraged to seek professional help. If requested, informational assistance including assistance in making arrangements will be available.

The labor-management committee or an appointed sub-committee may review suspensions on a case-by-case basis and recommend any needed courses of action and assistance as is appropriate and available.

The above suspension may be extended for a reasonable time for an employee who has voluntarily submitted to a rehabilitation program which requires more than 30 days. Written notice of the rehabilitation director is required for an extension.

An employee who tests positive following a suspension period will be subject to termination for cause and denial of access to the job site. These individuals will be eligible for reconsideration after six (6) months if work is available.

Exhibit A to Eckerle deposition. The program calls for the performance of the drug testing to be done by a method called the Enzyme–Multiplied–Immunoassay Technique ("EMIT"). Where the EMIT test is positive, a confirmation test is to be run on a gas chromatographic/mass spectrometer ("GC/MS"). *See* Exhibit G to Eckerle deposition at p. 3.

With respect to the collection of the urine specimens, the procedure is described as follows:

Personnel will individually proceed to the sample collection room where the designated RUST representative will process the necessary forms and then collect approximately 80 milliliters of urine specimen. After collection, a label will be attached to the receiving container and the label will be initialed by the individual submitting the sample. The evidence tape used to seal the lid of the specimen container will be dated and signed by the designed RUST representative and initialed by individual submitting sample. The individual submitting the sample will then initial the outer tamper-proof bag. The person submitting the specimen and the designated RUST representative will sign the chain of custody form, note the date and time the specimen was obtained. All specimens collected during the day will be stored in a container in a secured area while awaiting pick-up by the laboratory courier.

Exhibit G to Eckerle deposition at p. 3.

Rust first began testing its employees under the policy on April 27, 1988. The Rust computer selected plaintiff for the initial six-month screening on October 26, 1988. Rust had no reason to believe that plaintiff was engaged in the sale, use or possession of illegal drugs either on-site or off-site or that he had ever engaged in such activities. His name simply came up on the computer for testing. Plaintiff refused to submit to the test on the grounds that it was a violation of his "rights as a citizen" and his constitutional rights. Pursuant to the written policy, Rust suspended plaintiff for 30 days. In addition, pursuant to the policy, if Ensor refused to be tested at the end of that 30 days, he would be terminat-

ed and ineligible for rehire for six months. Plaintiff filed the instant action before the 30–day suspension expired. Rust has agreed to extend the suspension indefinitely pending the outcome of this action, agreeing that Ensor will not be terminated while he pursues this claim.

### III.

*Plaintiff's Fourth Amendment Claim*

Plaintiff contends that the defendant's mandatory drug testing by urinalysis program constitutes an unreasonable search violative of the Fourth Amendment to the United States Constitution. At this point there can be little question that mandatory urinalysis under Rust's drug testing program constitutes a "search" within the meaning of the Fourth Amendment. *Lovvorn v. City of Chattanooga,* 846 F.2d 1539, 1542 (6th Cir.1988), *vacated, reh. en banc granted* 861 F.2d 1388 (6th Cir.1988); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 176 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988).

However, the Fourth Amendment prohibits only searches and seizures which are "unreasonable". The determination of whether a search is reasonable depends upon its particular circumstances and context. *See O'Conner v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987). The determination of the "standard of reasonableness applicable to a particular class of searches requires balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion." *Id.* (*quoting United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)).

In conducting this balancing test, a court must consider four factors: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). On one side of the balance are the employees' reasonable expectations of privacy—those expectations which society is "prepared to recognize as legitimate." *New Jersey v. T.L.O.,* 469 U.S. 325, 338, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) (*quoting Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). On the other side of the balance is "[t]he governmental interest [in] the efficient and proper operation of the workplace." *O'Conner,* 107 S.Ct. at 1501. The balancing inquiry has two reference points: the court must determine first "whether the [search] was justified at its inception," *T.L.O.,* 469 U.S. at 341–42, 105 S.Ct. at 742–43 (*quoting Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)); and second, "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justify the interference in the first place,'" *id.* 469 U.S. at 341, 105 S.Ct. at 743 (*quoting Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).[2]

The Sixth Circuit in *Lovvorn* described the focus of the inquiry that must be made as follows:

We believe there must be a focus on the particular nature of the employment sector to be tested. More specifically, there must be an inquiry into the harm that will result to society if mandatory drug tests are not allowed in that industry. The higher the cost and the more irretrievable the loss, the stronger the argument for finding reasonable the initiation of a drug testing program. We

**2.** In *Lovvorn,* 846 F.2d at 1545, the United States Court of Appeals for the Sixth Circuit rejected the reasoning adopted by a number of courts which have considered the amount of government regulation in a given employment context as a basis for determining whether an individual employee's privacy interests are less weighty than the government's asserted interests. *See, e.g., Shoemaker v. Handel,* 795 F.2d 1136 (3rd Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (upholding drug testing of jockeys and other horse racing employees in heavily regulated racing industry). Accordingly, this court does not consider the amount of government regulation as a factor in determining the weight to give plaintiff's privacy interests.

believe society has a right to protect itself from the infliction of irretrievable catastrophic losses. When determining whether any search is reasonable, there must be consideration of the benefits that inure from the existence of that search. As the harm to society of not conducting the search of an individual increases to potentially catastrophic levels, the less willing is society to consider reasonable that individual's subjective expectations of privacy.

Not only must there be an analysis of the potential harm to society of an impaired employee in a given sector, but there must also be a determination of the extent to which mandatory drug testing will decrease the risk of such harm being imposed on society. Implicit in this analysis, of course, is the question of how incompatible is job performance in that sector with the usage of illegal drugs. Also implicit in this inquiry is the question of how often a drug test will register positive though the tested employee is not in fact impaired on the job. *Lovvorn*, 846 F.2d at 1546–47. The court further noted that "there is a continuum of employment categories that are defined by the degree of suspicion that a drug problem exists and the potential harm to society of an impaired employee operating in that employment sector." *Id.*, at 1547.

■ In considering the benefits to society of Rust's mandatory drug testing program, the court observes that the danger created by an impaired employee on the job site in the vicinity of fissionable materials is extremely great not only to the employee himself, but also to other employees and the public in general. In addition, employees with access to these protected areas have access to sensitive information which may make them a national security risk. Those national security interests are implicated when the employee is engaged in the possession or use of illegal drugs even off the job site since it creates a risk of extortion or bribery. Rust employees at Y–12, including the plaintiff, are in a position to impose significant, irretrievable losses on society. The danger is so great both from safety and national security standpoints

that I do not believe Rust needs to demonstrate widespread drug usage among its employees before initiating testing. In fact, it would be foolhardy for Rust not to take every reasonable step it could to identify drug use among its employees. Under those circumstances, I am of the opinion that there was sufficient justification for initiation of drug testing. *See Rushton v. Nebraska Public Power District,* 844 F.2d 562 (8th Cir.1988) (upholding mandatory testing of nuclear plant employees).

Since I am of the opinion that there was significant justification for initiation of the drug tests, we must further consider "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Lovvorn*, 846 F.2d at 1548 (*quoting T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 743). The court finds, with one possible caveat, that the proposed search is reasonably related in scope to the circumstances which justified the interference in the first place. The extreme danger created by an employee engaged in illegal drug use, either on-site or off-site, in this case requires that Rust attempt to reduce illegal drug possession and use by its employees to as near zero as possible. Random urinalysis is a reasonable method of attempting to accomplish that goal. Rust has obviously taken pains to establish a comprehensive written policy explaining the drug testing policy and procedures to its employees. The policy implemented by Rust forewarns the employees that they will be subject to that testing. The information obtained in the tests is confidential. The employees to be tested are randomly selected by computer, and an employee testing positive cannot be retested for 90 days, but the policy insures that all employees will be tested within a three-year period. This policy protects an employee from repeated, unnecessary testing, but at the same time maintains the benefit of random or surprise testing. These factors convince the court that the scope of the search is reasonably related to the justification for the testing. The nature of Rust's work requires the virtual elimination of illegal

drug usage among its employees. To achieve this goal the scope of the tests will obviously have to be relatively intensive.

The court notes that there is one other factor regarding the scope of the search which was not mentioned in the proof presented to the court (although it was referred to in defendant's motion for summary judgment). An unobserved urine test is clearly less intrusive than one that is observed. *Lovvorn,* 846 F.2d at 1548. Rust's drug testing policy which was submitted as evidence does not mention whether the testing was to be observed or unobserved. The plaintiff makes no allegation that the test was to be observed. In an affidavit in support of Rust's motion for summary judgment, Mr. Eckerle states that under the program which has been implemented, collection of the urine samples has been unobserved. However, this affidavit was not proof considered by the court in this case. Given the important individual rights implicated, this court is of the opinion that the defendant should, as it apparently does, maintain a policy of non-observance during the testing, and that that policy should be expressly included in its written policy. It appears to the court that the issue of observance during testing was inadvertently omitted from the otherwise thorough written policy. Evidence on the issue was apparently not presented to this court by the defendant since plaintiff has not raised a question regarding observance during the actual testing. Under the circumstances, the court is of the opinion that the defendant should be permitted an opportunity to amend its written policy to indicate whether the testing will be observed or unobserved. Since defendant apparently has been utilizing unobserved tests anyway, I do not think that such an amendment would be a great imposition. I believe that this amendment is necessary in order to clarify the scope of the search that Mr. Ensor might be subjected to. The defendant will be afforded ten (10) days from the date of the entry of this opinion within which to indicate to the court that it has clarified its written policy on the issue of test observance. If the defendant is unable to do so, this court will reconsider

whether the search proposed is "reasonably related in scope to the circumstances which justified the interference in the first place", *see Lovvorn,* 846 F.2d at 1548, and consider vacating this opinion.

Plaintiff makes several other arguments which the court feels must be addressed. First, plaintiff points out that the drug test at issue measures drug usage, not on-the-job impairment. In finding that the government interests involved do not justify the drug testing in the case of the Chattanooga firefighters, the Sixth Circuit pointed out this same flaw in similar drug testing. *See Lovvorn,* 846 F.2d at p. 1548. However, there is an important distinction between this case and the case of a firefighter. In the case of a firefighter, the paramount governmental interest is a safety concern for injuries which might be caused by a firefighter impaired on the job. With respect to an employee with access to secure areas in a nuclear weapons component factory, there is the additional national security concern which is implicated whether the employee is using illegal drugs on-site or off-site. Thus, in the instant case, the drug testing does not have the same "inherent flaw" as recognized in *Lovvorn. Id.*

The plaintiff argues that although he works in protected areas he does not perform any job that is particularly dangerous. He contends that the defendant has not pointed out any danger that an employee in plaintiff's position could cause if he were impaired on the job. The court disagrees. Plaintiff's testimony indicated that even as a delivery person he is responsible for rigging heavy parts and equipment for cranes to lift and move and that he has rigged deliveries which are lifted over or around various buildings, including MAA areas, at the site. As a pipefitter Ensor is subject to be assigned to perform process pipefitting work on water and ventilation systems in protected areas, and some of those systems serve MAA areas. Extreme danger could be involved if plaintiff was to cause an accident affecting areas where fissionable material was located. Plaintiff argues that defendant is express-

ing concerns regarding possibilities as opposed to probabilities. Given the extreme danger involved, defendant is justified in being concerned with possibilities. Given the nature of the industry and the danger involved, the defendant must be afforded an opportunity to reduce the possibility of an accident caused by an impaired employee to its lowest reasonable level. In this area, even a slight possibility of safety or security breach is unacceptable.

## IV.

### Plaintiff's Other Claims

 Plaintiff also claims that the Rust drug testing program violates his Fifth Amendment rights. Presumably, plaintiff is referring to the penumbral right of privacy recognized in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Although it is not clear that a urinalysis constitutes an infringement of constitutional privacy rights, even if it is, those rights are subject to limitation by countervailing state interests. Any privacy rights that plaintiff may have are outweighed in this case by the compelling governmental interest of insuring drug free employees at a plant where components for nuclear weapons are manufactured. Moreover, the court notes that the confidentiality of the test results is not raised as an issue by plaintiff in this case. Thus, in the sense of public disclosure of the test results, plaintiff's privacy interests are not implicated. *See Smith v. White*, 666 F.Supp. 1085 (E.D.Tenn.1987), *affirmed*, 857 F.2d 1475 (6th Cir.1988).

Plaintiff's claims under the Fourteenth Amendment and under 42 U.S.C. § 1983 must be dismissed because there is no state, as opposed to federal, action alleged. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 837–38, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982).

Plaintiff's claims under the Tennessee Constitution are brought under Article 1, Sections 7 and 8. Section 7 is identical in intent and purpose with the Fourth Amendment to the United States Constitution. *Sneed v. State*, 221 Tenn. 6, 423 S.W.2d 857

(1968). For the same reasons that Rust's drug testing policy does not violate plaintiff's Fourth Amendment rights, it does not violate his rights under Article 1, Section 7 of the Tennessee Constitution.

Article 1, Section 8 is synonymous with the due process clauses of the Fifth and Fourteenth Amendments. *State v. Bobo*, 727 S.W.2d 945, 952 (Tenn.1987). For the same reasons that plaintiff has no claim under the Fifth Amendment, he has no claim under Article 1, Section 8 of the Tennessee Constitution.

## V.

### Conclusion

In light of the foregoing, the court concludes that the defendant's drug testing policy as applied to plaintiff Brian Ensor is not unconstitutional, and judgment will enter in favor of the defendant.

Order accordingly.