935 F.2d 269
 6 Indiv.Empl.Rts.Cas. 896, 1991 O.S.H.D.
(CCH) P 29,396
Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Brian D. ENSOR, Plaintiff-Appellant,
v.
The RUST ENGINEERING CO., Defendant-Appellee.
 No. 89-5106.
 United States Court of Appeals, Sixth Circuit.
 June 4, 1991.
 
 Before DAVID A. NELSON and RYAN, Circuit Judges, and MEREDITH, District Judge.*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is an appeal by a worker at a nuclear weapons plant from a summary judgment rejecting the worker's challenge to the constitutionality of a mandatory drug testing program. We agree with the district court's conclusion that the drug testing program was not unconstitutional, and we shall affirm the judgment.
 
 
 2
 * Plaintiff Brian Ensor is a pipefitter and delivery person for defendant Rust Engineering Co. As a prime contractor of the United States Department of Energy, Rust performs construction and maintenance work at the nuclear facility at Oak Ridge, Tennessee. The Oak Ridge facility's Y-12 plant, the site of Mr. Ensor's work, is used for the fabrication and assembly of nuclear weapons components and for research and development associated with these activities.
 
 
 3
 The entire Oak Ridge facility is heavily fortified and guarded. Access to different areas within the Y-12 plant itself is subject to graduated security restrictions. "Uncleared" areas are accessible to anyone who has been permitted to enter the Oak Ridge facility. No security clearance is required to enter the uncleared areas. Entry into "secured" areas requires an individual to have (or to be escorted by someone who has) a "Q" clearance--analogous to a "top-secret" clearance--from the Department of Energy. Access to "protected" areas is still more highly restricted, and only Q-cleared individuals may enter absent extraordinary circumstances.
 
 
 4
 Protected areas are enclosed in double or triple concentric fences with barbed wire and a no-man's land between the wires. There are multiple security checks and screening points throughout the protected areas. Automobiles entering these areas are regularly searched, as are toolboxes and other containers. Within the protected areas are the most highly secured sections, known as "Material Accountability Access" ("MAA") areas. It is in these MAA areas that fissionable nuclear materials are handled. Access to the MAA areas is restricted to Q-cleared individuals who have received specialized training.
 
 
 5
 Like other construction employees working in the secured and protected areas, plaintiff Ensor is required to have a Q-clearance. To obtain this clearance an individual must complete a detailed questionnaire disclosing a variety of personal associations and habits, and he must undergo a thorough background investigation. The investigation and questionnaire cover, among other things, the employee's use or possession of illegal drugs.
 
 
 6
 Mr. Ensor has been employed by Rust, primarily at the Y-12 plant, since May of 1985. He first received a Q-clearance almost 10 years ago, during an earlier term of employment as a pipefitter for Rust. His Q-clearance permits him unsupervised access to secured and protected areas of the Y-12 facility. Mr. Ensor cannot freely enter the MAA areas, but with specialized orientation he could obtain access to an MAA area for work on a particular project.
 
 
 7
 Although Mr. Ensor is a journeyman pipefitter, his day-to-day responsibilities in recent years have consisted primarily of delivering requisitioned materials from a company warehouse to locations inside the protected areas. A driver accompanies Mr. Ensor on these deliveries. The work includes the loading and unloading, by hand or machine, of the requisitioned parts, and Mr. Ensor is also responsible for the rigging of heavy parts and equipment for cranes to move. Occasionally he is assigned by his foreman to work as a pipefitter, and he can be assigned such work at any time.
 
 
 8
 In April of 1986 Rust began to negotiate with the collective bargaining agent for its employees over a program under which all Rust personnel at the Oak Ridge facility would be subject to random drug testing. The negotiations were successful, and testing was begun in April of 1988 after an arbitrator ruled that implementation did not have to await a new collective bargaining agreement. Mr. Ensor's union stipulated to the reasonableness of the program.
 
 
 9
 The program contained the following provision for employee testing:
 
 
 10
 "Employee Testing: Within a six (6) month period of time, beginning on the implementation date of this program, all employees will be selected for drug testing. The names and/or numbers will be selected in an unbiased manner by computer and scheduled accordingly. Refusal of any individual to submit to drug testing will result in an automatic 30-day suspension from the site without pay. A drug test must be performed before reinstatement of employment; continued refusal will subject employee to termination and denial of access to the job site.
 
 
 11
 Employees who test negative will not be subjected to further testing for 90 days, except for cause as stated under Abnormal Behavior Testing. After that time their names will be included in a Periodic Employee Testing Program which will insure retesting at least once during each individual's 36-month retest cycle.
 
 
 12
 Abnormal Behavior Testing: Any employee who demonstrates signs of abnormal behavior (unusual mental responses, unusual physical function, emotional instability, etc.) is to be reported to their principal supervisor, additionally, employees may be investigated in connection with safety or security incidents. The principal supervisor and the designated drug abuse coordinator will determine if drug testing and/or other action is appropriate on a case-by-case basis. Supervision will be trained to detect abnormal behavior.
 
 
 13
 Disciplinary Actions: An employee who tests positive for drug use will be suspended from the site without pay for 30 days. At the end of the suspension period, if work for the employee is still available, another test will be performed. If this test is negative, the employee will be returned to work.
 
 
 14
 An employee who tests positive will be counseled and encouraged to seek professional help. If requested, informational assistance including assistance in making arrangements will be available.
 
 
 15
 The labor-management committee or an appointed sub-committee may review suspensions on a case-by-case basis and recommend any needed courses of action and assistance as is appropriate and available.
 
 
 16
 The above suspension may be extended for a reasonable time for an employee who has voluntarily submitted to a rehabilitation program which requires more than 30 days. Written notice of the rehabilitation director is required for an extension.
 
 
 17
 An employee who tests positive following a suspension period will be subject to termination for cause and denial of access to the job site. These individuals will be eligible for reconsideration after six (6) months if work is available."
 
 
 18
 The Rust computer selected Mr. Ensor for his initial six-month screening on October 26, 1988. He refused to submit to the test, contending that it was a violation of his constitutional rights and his rights as a citizen. Rust suspended him for 30 days and told him that he would be discharged if he refused to be tested at the end of that period. The instant action was filed before the 30-day suspension expired. Rust agreed to extend the suspension indefinitely pending the outcome of this action, and the company promised not to terminate Mr. Ensor's employment while he pursues this claim.
 
 
 19
 Stipulating to the pretermission of the question whether the company's drug testing activities constitute "government action" for constitutional purposes, the parties agreed to submit the case to the district court on a record that included the depositions of the plaintiff and John J. Eckerle, Jr., a project manager with Rust. Objections to the relevance of portions of Mr. Eckerle's testimony were preserved. Overruling these objections, the court made findings of fact and conclusions of law that led to entry of judgment in favor of the defendant. Ensor v. Rust Eng'g Co., 704 F.Supp. 808 (E.D.Tenn.1989) (Jarvis, J.). This appeal followed.
 
 II
 
 20
 The constitutional provisions cited by Mr. Ensor (the Fourth and Fifth Amendments of the United States Constitution) restrict action by the government, not action by private persons. The plaintiff's complaint alleges that "[a]ll acts complained of ... is [sic] governmental action," and Rust's answer denies that the acts complained of constitute governmental action. If Rust were to prevail on this issue, Mr. Ensor would have no constitutional claim on which relief could be granted.
 
 
 21
 Both parties view the issue of governmental action as a close question the proper resolution of which would require extensive discovery. Desiring to avoid the cost of such discovery if possible, and believing, apparently, that the case might be disposed of on a ground that would make it unnecessary to reach the governmental action question, the parties caused the following stipulation to be read into the record before the district court:
 
 
 22
 "The parties agree that they desire a determination as to whether Rust's drug testing program is reasonable under the Fourth Amendment without reaching the question of whether Rust's drug testing program at the DOE's Oak Ridge facility consists [sic] federal government action for constitutional purposes. The parties recognize that this Amendment [sic] shall not constitute an admission of government action in this or any other proceeding."
 
 
 23
 We do not read this stipulation as suggesting that the district court could grant the injunctive relief and damages sought by the plaintiff without determining that the drug testing program, in addition to subjecting the plaintiff to "unreasonable searches" within the meaning of that term as used in the Fourth Amendment, constituted action by the government. Subject matter jurisdiction cannot be conferred by agreement, see Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinea, 456 U.S. 694, 702 (1982), and on the facts of this case we would have a serious problem with a stipulation that sought to empower the district court to enter a final judgment for the plaintiff without finding that governmental action had occurred. But the reasonableness of the search appears to be an easier question than the governmental action question, and we have no problem with the parties simply inviting the court to decide the easier question first.
 
 
 24
 There is ample precedent for a court's putting a governmental action question on the back burner while it decides whether the actions complained of would violate the Constitution assuming governmental action existed. That is what the Supreme Court seems to have done in Public Utilities Commission of District of Columbia v. Pollak, 343 U.S. 451 (1952), where the Court assumed without deciding that the playing of radio programs to captive audiences by a privately owned but governmentally regulated street railway company constituted governmental action; the Court then went on to uphold the constitutionality of such action. In Columbia Broadcasting System Inc. v. Democratic National Committee, 412 U.S. 94 (1973), similarly, the Supreme Court found it unnecessary to decide whether the refusal of broadcasters to accept editorial advertising constituted governmental action; the Court held that such refusal would not violate the Constitution in any event. To the same effect see Johnson v. F.C.C., 829 F.2d 157, 159-60 n. 10 (D.C.Cir.1987) ("Because we ultimately conclude that petitioners possessed no substantive First Amendment right to be included in the 1984 presidential and vice-presidential debates, we need not determine whether their exclusion by the broadcasters constituted governmental action for First Amendment purposes"), and Ripon Society, Inc. v. National Republican Party, 525 F.2d 567, 576 (D.C.Cir.1975) (en banc), cert. denied, 424 U.S. 933 (1976) (declining to decide state action question where "it is clear to us that plaintiffs' case must fail on its merits without regard to whether or not there is state action....")
 
 
 25
 In the case at bar the district court accepted the parties' invitation to assume, at least initially, that defendant Rust was a government actor. This was an appropriate choice, in our view. And like the district court, we shall consider whether the drug testing program would be constitutional if it be assumed arguendo that enforcement of the program represents governmental action.
 
 III
 
 26
 After the district court's decision in this case, the Supreme Court ruled on two cases involving drug testing: National Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989), and Skinner v. Railway Labor Executives' Association, 489 U.S. 602 (1989). These cases make it clear, among other things, that: (1) drug testing programs entail "searches" that are subject to the reasonableness requirement of the Fourth Amendment, see, e.g., Skinner, 489 U.S. at 617; and (2) "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." Von Raab, 489 U.S. at 665-666. See generally Penny v. Kennedy, 915 F.2d 1065 (6th Cir.1990) (en banc).
 
 
 27
 Rust contends that it became interested in a drug testing program for its employees because it discovered marijuana in the possession of one of its pipefitters in December 1984, because of awareness of the growing incidence of illegal drug usage in the general population, and because of the severe safety and national security concerns that such illegal drug usage could cause if carried on by a Rust employee at the Oak Ridge site. Mr. Ensor counters that his job does not entail working with nuclear materials and that he does not have access to MAA areas, at least at present. The district court found, however, that Mr. Ensor could be assigned to work on water and ventilation systems in protected areas, some of which serve MAA areas, and that the threat to public safety and national security that illegal drug use would pose is extremely great:
 
 
 28
 "[T]he danger created by an impaired employee on the job site in the vicinity of fissionable materials is extremely great not only to the employee himself, but also to other employees and the public in general. In addition, employees with access to these protected areas have access to sensitive information which may make them a national security risk. Those national security interests are implicated when the employee is engaged in the possession or use of illegal drugs even off the job site since it creates a risk of extortion or bribery." 704 F.Supp. at 814.
 
 
 29
 We agree with this analysis of the governmental interests at stake. These interests are sufficiently strong, we believe, to overcome Mr. Ensor's argument that a drug testing program not based on individualized suspicion is simply unnecessary. We recognize that the testing program here may be broader than those upheld in Von Raab, where only employees seeking promotion to jobs involving the carrying of firearms and the interdiction of illegal drugs were tested, and Skinner, where the only employees tested had been involved in accidents. But Rust has a compelling interest in deterring illegal drug use before it happens at the job site and before an espionage agent can reach the user. We do not think that the Constitution requires that there actually be a nuclear accident, or a sale of nuclear secrets to unauthorized persons, before the company can take steps to minimize the risks about which it is concerned.
 
 
 30
 Rushton v. Nebraska Public Power District, 844 F.2d 562, 566 (8th Cir.1988), which upheld the random testing of workers at a nuclear power generating plant, is persuasive on this point. Foreshadowing Von Raab and Skinner, Rushton balanced "the individual's legitimate expectation of privacy and personal security against the government's need for the search." 844 F.2d at 566. The plaintiffs in Rushton were two engineers who usually worked in an office, but who had unescorted access to restricted areas and visited the nuclear power plant six to seven hours each month. In upholding the testing program the Eighth Circuit rejected the plaintiffs' contention that the existence of other safety precautions and the plaintiffs' relatively limited time at the plant made it unlikely the plaintiffs could do damage; the court was more impressed by the fact that drug-induced mistakes could lead to serious injuries and high containment costs. Id. at 565.
 
 
 31
 Also instructive is Thomson v. Marsh, 884 F.2d 113 (4th Cir.1989) (per curiam), in which the Fourth Circuit, relying on Skinner and Von Raab, upheld random drug testing of civilian employees at a U.S. Army chemical weapons plant. The plaintiffs in Marsh were a research biochemist and, coincidentally, a pipefitter; the duties of the latter included "the maintenance and construction of steam-fittings for chemical test chambers and toxic waste drains." Id. at 115. In the present case, as noted above, the district court found that the plaintiff could be assigned similar duties on pipes serving MAA areas.
 
 
 32
 As to Rust's concern about the possibility of blackmail, the D.C. Circuit accepted such concerns as valid in reversing a permanent injunction barring random testing of Department of Justice employees with top-secret clearance. Harmon v. Thornburgh, 878 F.2d 484 (D.C.Cir.1989), cert. denied, 110 S.Ct. 865 (1990).[1] The court noted:
 
 
 33
 " 'We readily agree that the Government has a compelling interest in protecting truly sensitive information....' But whatever the precise scope of 'truly sensitive' information, it seems evident that top secret national security materials lie at its very core. We therefore believe that the government's interest in protecting these materials outweighs the employees' privacy interest, despite the fact that the [random] testing program is somewhat more intrusive than the [testing of applicants for promotion] upheld in Von Raab."
 
 
 34
 878 F.2d at 491-92 (quoting Von Raab, 489 U.S. at 677).
 
 
 35
 Mr. Ensor points to the fact that employees of the government and of other contractors at the Y-12 plant are not drug tested, and that Rust does not test for alcohol use. He claims that this demonstrates that it is not impractical to use less intrusive measures or to wait for cause before testing. Although the absence of other testing programs is evidence of what others at the plant find necessary for safety and security, it is not dispositive. See American Federation of Government Employees v. Skinner, 885 F.2d 884, 896-97 (D.C.Cir.1989), cert. denied, 110 S.Ct. 1960 (1990). The fact that a certain precautionary measure is not widely taken, or that other such measures exist, does not necessarily mean that the measure in question is superfluous or unreasonable. See Rushton, 884 F.2d at 565. The reasonableness of the program does not necessarily turn on the existence of less intrusive alternatives. See American Federation, 885 F.2d at 897.
 
 
 36
 Turning to the privacy expectations present here, we agree with the district court that Mr. Ensor has little expectation of privacy in matters relating to his employment. First, nuclear-related industries are heavily regulated by the government, decreasing expectations of employees' privacy. See Skinner, 489 U.S. at 627; Rushton, 844 F.2d at 566. Second, despite his claim of holding an innocuous position, Mr. Ensor is required to maintain a Q-clearance. Retention of this clearance is predicated on his continuing to be subject to investigation with respect to his behavior, his acquaintances, his organizational associations, and his use of alcohol and other drugs. These circumstances are comparable to those associated with the Justice Department employees who held top-secret clearances in Harmon--circumstances that the D.C. Circuit found sufficient to warrant a mandatory drug testing program. And in American Federation of Government Employees v. Skinner, the same court permitted random drug testing of Department of Transportation motor vehicle operators on the ground, primarily, that they are required to maintain secret or top-secret clearances. 885 F.2d at 892-93.
 
 
 37
 We do not believe that a holder of a high security clearance has much expectation of privacy in any matter that can come under investigation as a condition of retaining that clearance. Use of illegal drugs certainly falls in this category. Where, as here, the low expectation of privacy is balanced against a compelling interest in public safety and national security, mandatory testing for illegal drug use is not unreasonable.
 
 IV
 
 38
 Mr. Ensor also contends that his Fifth Amendment rights are offended by Rust's drug testing scheme. This claim is without merit. Drug testing does not invade any sphere of privacy heretofore accorded protection by the Supreme Court under the Fifth Amendment. See generally J. Nowak, R. Rotunda & J. Young, Constitutional Law 684-721 (3d ed. 1986). We have already found that Rust's concerns for safety and security, combined with plaintiff's low expectation of privacy, justify the drug testing policy, so the only privacy concern that could conceivably remain would be unauthorized disclosure of the information thus obtained. See Shoemaker v. Handel, 795 F.2d 1136, 1144 (3d Cir.), cert. denied, 479 U.S. 986 (1986). Mr. Ensor does not allege any such disclosure.
 
 
 39
 More importantly, perhaps, it is now well established that drug testing programs such as the one at issue here entail "searches" within the meaning of the Fourth Amendment. In the face of the Fourth Amendment's express prohibition against unreasonable searches, we should be reluctant to analyze the challenged conduct in the light of generalized concepts emanating from the Fifth Amendment. See McDowell v. Rogers, 863 F.2d 1302, 1306 (6th Cir.1988), and Walker v. Norris, 917 F.2d 1449, 1455 (6th Cir.1990). See also Graham v. Conner, 490 U.S. 386, 395 (1989), where the Supreme Court held that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." The more generalized notion of a Fifth Amendment "right of privacy" is no more appropriate as a guide in this case than "substantive due process" would be.
 
 V
 
 40
 Mr. Ensor also objected to the district court's consideration of certain parts of Mr. Eckerle's deposition testimony. This testimony concerned the catastrophic effects a drug abusing employee might cause at the Y-12 plant. We agree with the district court that
 
 
 41
 "[e]vidence concerning the potential safety hazards that might be caused by an impaired Rust pipefitter and the potential assignments which plaintiff might be given in his position as a pipefitter are both highly relevant with regard to the reasonableness of the Rust drug testing program." 704 F.Supp. at 809-10.
 
 
 42
 We also agree that the probative value of the evidence is not outweighed by any of the countervailing factors listed in Rule 403, Fed R.Evid. See 704 F.Supp. at 810.
 
 
 43
 Accordingly, and for the reasons more fully stated in District Judge Jarvis' well-reasoned opinion, the judgment is AFFIRMED.
 
 
 
 *
 The Honorable Ronald E. Meredith, United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 The court sustained the injunction against testing departmental employees who were merely involved with criminal prosecutions or who had access to secret grand jury proceedings. Id. at 490