**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 1245, et al., Petitioners,**

v.

**UNITED STATES NUCLEAR REGULATORY COMMISSION & United States of America, Respondents.**

**No. 90–70647.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1992.

Decided June 11, 1992.

Sanford N. Nathan, Leonard, Carder, Nathan, Zuckerman, Ross, Chin & Remar, Oakland, Cal., and Tom Danzell, Walnut Creek, Cal., for petitioners.

Charles E. Mullins, Office of the Gen. Counsel, U.S. Nuclear Regulatory Com'n, Washington, D.C., for respondents.

Before: FLETCHER, D.W. NELSON, and FERNANDEZ, Circuit Judges.

## OVERVIEW

D.W. NELSON, Circuit Judge:

Petitioner Local 1245 of the International Brotherhood of Electrical Workers ("Local 1245") appeals the Nuclear Regulatory Commission's ("NRC") refusal to exempt clerical, warehouse, and maintenance employees at the Diablo Canyon nuclear power plant from an industry-wide drug testing program. Local 1245 argues that the testing program is unconstitutional as applied to these employees because they do not have access to the "vital areas" of the plant, are highly supervised, and do not perform job duties that could compromise plant safety. We affirm the decision of the NRC. Local 1245 has failed to establish that the groups of workers in question are not in safety-sensitive positions.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 7, 1989, the NRC promulgated "fitness-for-duty" regulations that required all commercial nuclear power plants to develop and implement fitness for duty ("FFD") programs.[1] The regulations specified that each FFD program must include a random drug testing program for workers who have unescorted access to "protected areas" of nuclear facilities.[2] 10 C.F.R. § 26.24 (1990). In accordance with the regulations, the Pacific Gas and Electric Company, which owns and operates the Diablo Canyon nuclear power plant, adopted a new FFD program requiring random urine testing for Diablo Canyon employees to take effect beginning January 3, 1990.

Diablo Canyon is located at the end of an eight-mile road that is guarded twenty-four hours a day. The plant's facilities are divided into three areas with increasingly restricted access. The unprotected area contains the parking lots, a training building, construction and engineering offices, and secondary warehouses. The protected area of the plant contains the administrative building, the turbine building, and various warehouse, security, and fuel handling buildings.[3] Access to this area is restricted to individuals who have been granted "unescorted access" and employees must also pass through a series of control checkpoints before entering. Finally, the vital areas of the plant contain the auxiliary and containment buildings, which house the reactor, cooling pumps, generators, and other safety-sensitive equipment. Access to these areas is restricted to specified employees who are given special computer key cards. However, there are no guards at the entrances to vital areas, so an employee without a key card could theoretically follow another employee into the vital areas.

Local 1245 represents approximately 90 clerical employees at Diablo Canyon, with

---

1. The regulations were promulgated after full notice and comment proceedings.

2. "Protected areas" are defined as those areas of the plant surrounded by physical barriers and to which access is restricted. 10 C.F.R. § 26.3. The most sensitive areas of a nuclear facility are designated as "vital areas," which generally contain the reactor and other radiologically sensitive equipment.

3. The parties disagree about whether the protected areas of the plant contain equipment that is essential to safe plant operations. Local 1245 states simply that the protected area does not contain any safety-sensitive equipment. The NRC contends, without much more specificity, that the protected area contains equipment that provides additional pertinent information in the event of unusual conditions and provides "additional capacity" to cope with those conditions.

job titles ranging from "Routine Plant Clerk" to "Clerical Assistant." Both parties agree that the vast majority of these employees work only in the administrative building within the protected area, but that some clerical employees require access to vital areas of the plant.[4] Although clerical employees perform mainly secretarial and administrative duties, the NRC alleges that some of these employees process access and security clearances and would be required to staff the plant's emergency response center in the event of a nuclear emergency.

Local 1245 also represents approximately 50 warehouse employees who perform traditional warehouse functions such as receiving, storing, categorizing, and disbursing. Local 1245 contends that their work is not safety-related, in part because any safety-sensitive materials received at the warehouse are also checked by the plant's quality control department. The NRC responds that their work is safety-sensitive because any error in the cataloging or disbursing process could result in the wrong material being installed in a plant system. Although they disagree as to the frequency, both parties agree that warehousemen at least occasionally have to enter vital areas of the plant to deliver materials and equipment.

Between 250 and 300 maintenance workers are also members of Local 1245. These employees maintain and repair the mechanical and electric equipment of the plant. Local 1245 concedes that this work is considered safety-sensitive and of necessity is often performed within the vital areas of the plant.

On March 13, 1990, Local 1245 filed a letter with the NRC requesting that its members be exempted from Diablo Can-

yon's random drug testing program.[5] The NRC responded that it considered Local 1245's request to be both a petition for an exemption and a request that the NRC reconsider or amend its FFD rule. Accordingly, the NRC also referred Local 1245's petition to staff as a petition for rulemaking and told Local 1245 that it needed to file specific proposed amendments to the rule. Local 1245 chose not to pursue this course of action and accordingly never perfected a petition for rulemaking.

In regard to the petition for an exemption, both Local 1245 and Pacific Gas & Electric filed supplemental information pursuant to the NRC's request. On September 24, 1990, and without a hearing, the NRC denied Local 1245's request for an exemption, chiefly on the grounds that Local 1245 had not established that its employees differed in any significant way from similar employees at other power plants and that Local 1245 had not advanced any arguments different from those considered and rejected by the NRC at the time it promulgated the rule. The NRC also noted that all workers with access to protected areas of the plant had the potential both to distribute illegal substances to other plant employees and to threaten the safety of the plant. This appeal followed.[6]

## STANDARD OF REVIEW

■ We must uphold the NRC decision denying the exemption unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the arbitrary and capricious standard is narrow and we may not substitute our judgment for that of the agency. *Motor Vehicle Manufacturing Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29,

---

**4.** The NRC alleges that some clerical employees even require access to the plant's control room in order to perform their duties.

**5.** The NRC's rules permit exemptions which "will not endanger life or property or the common defense or security." 26 C.F.R. § 26.6.

**6.** On December 29, 1989, several individual Diablo Canyon employees filed suit against Pacific Gas & Electric seeking injunctive relief against

the random drug testing program. Although a temporary restraining order was initially granted, the district court later determined that it did not have jurisdiction, dissolved the order, and transferred the matter to the Ninth Circuit. The Ninth Circuit denied the plaintiffs' request for emergency relief and the plaintiffs eventually filed a motion for a voluntary dismissal of the appeal, which was granted on October 9, 1990.

43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

## DISCUSSION

■ In the past few years, many of the threshold questions regarding the constitutionality of drug testing have been settled.[7] First, "drug testing performed by private employers under compulsion of government regulation constitutes governmental action subject to constitutional restrictions." *Bluestein v. Skinner*, 908 F.2d 451, 455 (9th Cir.1990), *cert. denied*, ─ U.S. ─, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). Second, urinalysis constitutes a search subject to the restrictions of the Fourth Amendment. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives*, 489 U.S. 602, 616–18, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989). Third, "the usual Fourth Amendment requirements of a warrant and probable cause do not necessarily apply in the drug testing context." *Bluestein*, 908 F.2d at 455. Rather, when a search "serves special governmental needs, beyond the need for normal law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390.

Accordingly, we must balance the privacy interests of Local 1245's members against the government's interests to determine whether the application of the NRC's drug testing program to these employees is constitutional. In evaluating the privacy interests of Local 1245's employees, "[t]wo considerations guide our analysis: (1) whether as a result of other circumstances employees in this industry already have a diminished expectation of privacy; and (2) whether the particular testing program minimizes the intrusion of privacy." *IBEW, Local 1245 v. Skinner*, 913 F.2d 1454, 1463 (9th Cir.1990). Local 1245 concedes that by virtue of their employment in an extensively regulated industry,[8] employees of nuclear power plants have a diminished expectation of privacy. *See Rushton v. Nebraska Public Power District*, 844 F.2d 562, 566 (8th Cir.1988). Moreover, Local 1245 mounts no challenge to the procedures used in conducting the drug tests. The critical question is thus whether the government's asserted interests rise to a sufficient level to justify random testing of these employees.

The NRC asserted governmental interests in public safety and in the reliability and integrity of its workforce in denying Local 1245's request for an exemption, but it advances only the public safety rationale before this court.[9] As to this rationale, the NRC emphasizes that the nuclear power industry has the potential to inflict catastrophic harm on society. Indeed, courts have repeatedly used the nuclear industry as an example of a workplace that "could produce such catastrophic social harm that

---

**7.** As a preliminary matter, we note that the NRC initially argued that Local 1245 was not entitled in this proceeding to seek review of the constitutionality of the FFD regulation as applied to its workers. The NRC has since conceded that we can indeed consider Local 1245's constitutional challenges when reviewing the application of the regulation. *See Commonwealth Edison Co. v. NRC*, 830 F.2d 610, 614 (7th Cir.1987) ("indirect challenges to the rule brought when the rule is applied to a particular individual are within the court's jurisdiction.").

**8.** For example, the NRC requires extensive background checks of employees granted unescorted access, access to nuclear power plants is severe-

ly limited, and employees are closely observed while inside the plant.

**9.** The NRC wisely decided to refrain from pursuing its integrity of the workforce rationale on appeal. This rationale has almost uniformly been rejected by the courts as insufficient to justify drug testing of employees. *See, e.g., Taylor v. O'Grady*, 888 F.2d 1189, 1196 (7th Cir. 1989) ("A generalized interest in the integrity of the workforce is, however, not enough to overcome the privacy interests at issue."); *Harmon v. Thornburgh*, 878 F.2d 484, 490 (D.C.Cir.1989) (noting that integrity of the work force rationale found no support in *Von Raab*), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).

no risk whatever is tolerable." *Von Raab*, 489 U.S. at 684, 109 S.Ct. at 1400 (Scalia, J., dissenting). The NRC also asserts that all persons who have unescorted access to the protected areas of a nuclear power plant have the potential to endanger public safety, even if their own jobs are not safety-related and even if they are not permitted to enter the vital areas.

■ The NRC advances three arguments in support of this assertion. First, the NRC suggests that workers could smuggle drugs into the facility. We find this theory insufficient to justify testing in the nuclear power industry. Cases that have accepted this rationale have generally involved drug testing of prison guards. *See, e.g., Taylor*, 888 F.2d at 1197. Although prison guards or even customs officials may have ready access to both a supply of and a demand for drugs, this possibility seems far more remote in a nuclear power plant.

■ Second, the NRC argues that drug-impaired workers could engage in deliberate or accidental actions that could threaten safety systems. As an actual example, the NRC cites a crane operator at Diablo Canyon who—although he was not under the influence of drugs at the time—knocked over a power line, causing a power outage in one of the plant's safety systems. Another hypothetical example even more directly germane to this case is that of a drug-impaired worker roaming freely through the plant's control room, a situation obviously fraught with the danger that the worker will accidentally interfere with a safety system. The NRC's third argument is the possibility that a drug-impaired worker could interfere with the ability of a worker in a clearly safety-sensitive position to operate and maintain the plant. To return to the control room example, an employee could become distracted from his responsibilities by the pressing need to re-

move a drug-impaired coworker from the scene. Because of their speculative nature, these latter arguments are not entirely persuasive. We do not deny that the government has a strong interest in random testing of nuclear industry employees who are in safety-sensitive positions. However, the government's blanket inclusion of all workers in protected areas may in some cases be overkill.

If Local 1245 were able to establish that the clerical workers did not engage in any safety-sensitive work and had no access to the plant's vital areas, the balance of interests might well be different. However, it is apparent that at least some of the clerical employees at Diablo Canyon do enter the vital areas of the plant and may have safety-related responsibilities. Moreover, it appears that this group of clerical workers with access to vital areas is not a static one; the composition of the group could vary because of task assignments or workshifts. On the record before this court, it is impossible for us to ascertain whether there is some group of clerical workers for whom testing would be inappropriate. We suspect many clerical workers cannot fairly be classified as having safety-sensitive jobs. However, in light of our inability to distinguish between those clerical workers who pose a real threat to public safety and those who do not, we are unwilling to reverse the NRC's denial of an exemption at this time.[10]

■ In the case of the warehouse employees, from the record before us, it appears many are engaged in work that is sufficiently safety-sensitive to warrant upholding the NRC's denial of an exemption. These employees apparently actually handle safety-sensitive material and often enter the vital areas of the plant to make deliveries. Local 1245 argues that the fact that the work hours of warehouse employ-

---

**10.** The two cases that have considered drug testing in the nuclear power industry—although decided before the Supreme Court's 1989 decisions—also upheld the programs, emphasizing the vast potential for harm. In *Rushton*, 844 F.2d at 564, the Eighth Circuit found that drug testing of two engineers was constitutional, even though the men visited the plant for only six to

seven hours per month and the chance of their actually causing an accident was small. The Washington Supreme Court upheld drug testing for prospective pipefitters and plumbers at a nuclear power plant. *Alverado v. Washington Pub. Power Supply*, 111 Wash.2d 424, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

ees are not limited is proof that the employees are not engaged in safety-sensitive work. However, we rejected this argument in a drug testing case involving flight attendants. *Bluestein,* 908 F.2d at 457 ("The duty time decisions, however, do not stand for the proposition that impairment of ... performance is never a public safety consideration."). Local 1245 has failed to establish a discrete record as to certain warehousemen that would entitle some of them to exemptions.

■ Finally, we believe that random drug testing of the maintenance employees is clearly constitutional.[11] Local 1245 concedes that these workers, who are responsible for repairs on undisputably vital equipment, are indeed engaged in safety-sensitive work. Local 1245 argues instead that Diablo Canyon's design features, redundancy of safety systems, extensive training procedures, and the doublechecking of all maintenance work makes the drug testing program unnecessary. However, as we noted in a drug testing case involving pipeline workers, "[t]he heavy supervision of workers ... does not ... negate the need for other mechanisms to prevent accidents." *IBEW,* 913 F.2d at 1460 n. 14. The *Rushton* court rejected this same argument as well, concluding that extra safety measures were not made superfluous simply because the nuclear plant was designed to withstand an impaired operator. *Rushton,* 844 F.2d at 565. Because maintenance workers are engaged in undeniably safety-sensitive work, the de-

cision of the NRC regarding them is affirmed.[12]

## CONCLUSION

The decision of the NRC is AFFIRMED.

FERNANDEZ, Circuit Judge, with whom Circuit Judge FLETCHER joins, concurring:

This case demonstrates the wisdom shown by the founders of this nation when they insisted upon the adoption of the Fourth Amendment, despite the claims of many that the declaration of explicit guarantees was unnecessary and undesirable. *See The Federalist,* No. 84 at 531–36 (A. Hamilton) (B.F. Wright ed. 1961). It also demonstrates just how slippery the slippery slope we have stepped upon has become. Perhaps because I have slid down that slope with the rest of the judiciary, I can and do accept most of the reasoning contained in the majority opinion. I agree, also, that it is sufficiently clear that maintenance workers can be subjected to the indignity of mandatory drug testing. However, I believe the NRC went too far when it decided that all clerical workers must have their Fourth Amendment rights sacrificed on the altar of our drug fears.

Since the federal courts have entered upon the enterprise of balancing the privacy of workers against the "need" for testing, more and more citizens have become subject to the escorted trip to the bathroom. For example, railroad workers,[1] customs workers,[2] anyone with a security

---

**11.** The NRC contends that Local 1245 did not request an exemption for maintenance workers before the NRC and accordingly that Local 1245 may not raise this issue on appeal. We reject this argument. Local 1245's original letter requested an exemption for all Diablo Canyon employees represented by Local 1245, a group which includes maintenance workers. Moreover, in the supplemental materials provided to the NRC, Local 1245 included declarations from maintenance workers and expressly argued in its cover letter that the testing program was unnecessary because extensive protective measures were already in place. Local 1245's appeal regarding maintenance workers is properly before this court.

**12.** Local 1245 also makes a belated, non-constitutional argument in the conclusion of its brief

that the NRC's decision should be found arbitrary and capricious because it was not based on substantial evidence. This contention is without merit. The NRC explained specifically why it refused to grant the exemption and its decision, especially considering the closeness of the issue as to clerical workers, was a reasonable, if controversial, one. *See IBEW,* 913 F.2d at 1457; *Bluestein,* 908 F.2d at 457.

**1.** *Skinner v. Railway Labor Executives Assoc.,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

**2.** *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

clearance,[3] truck drivers,[4] gas pipeline workers,[5] airline personnel,[6] prosecutors of drug offenses,[7] correctional officers with regular prisoner contact,[8] jockeys,[9] and workers handling sensitive information[10] have all been found to be proper subjects of testing. Of course, it is true that we would feel a cold chill if we knew that workers in some of these categories were on drugs while performing their duties.

It is also true, however, that the courts have excluded some workers from testing programs, in spite of the desire of timorous bureaucrats to test everyone who can be found. So, courts have held that perhaps some accountants, lawyers, typists, clerks and messengers cannot be tested, even where other people in an agency can be.[11] We have suggested that some people who work about gas pipelines may also be protected from testing, if their jobs are not safety related. *IBEW, Local 1245,* 913 F.2d at 1462. Moreover, the Seventh Circuit has observed that administrative and back office personnel who do not pose any great threat to safety or other interests of the government are exempt, even if they work for the armed forces. *Dimeo,* 943 F.2d at 685. The Seventh Circuit has also held that a "generalized interest in the integrity of the work force" will not support a testing program. *Taylor,* 888 F.2d at 1199. In addition, even in a prison setting there can be no such testing of employees who neither come into regular contact with nor have opportunities to smuggle drugs to the inmates. *Id.*

Thus, it must be said that the courts have not yet become entirely insouciant about the Fourth Amendment rights of American workers. Still, the constant dripping of exceptions on the rock of those rights cannot help but have an effect. Each earnestly advanced argument makes the next one seem more plausible. That is particularly true since the explanatory ruminations that each case evokes from the courts offer up language to help the government's next argument. The arguments of the NRC regarding clerical workers demonstrate that.

■ Many if not most of those workers have basic tasks which are secretarial, typing, filing, collecting payroll information, preparing payrolls, tracking injuries, and carrying mail. How in the world can those tasks result in a nuclear disaster at a power plant? Well, the NRC says that a drug-taking clerk might smuggle drugs into the plant and distribute them to other people whose jobs are vital. The majority properly rejects that chimaera. Ah, says the NRC, but maybe a drug impaired secretary will wander into a vital area and distract someone or begin pushing buttons. Of course, the same could be said in any situation where a person with a non-vital function could possibly come into contact with a person who has a vital function. Perhaps a prison worker with no access to inmates could get access once or could interfere with a guard. *But cf. Taylor,* 888 F.2d at 1199. Or perhaps a non-frontline customs worker could interfere with a frontline worker, or induce him to do evil. *But cf. Von Raab,* 489 U.S. at 678, 109 S.Ct. at 1397. Or perhaps a back office person in the armed forces could run amok and harm national security. *But cf. Dimeo,* 943 F.2d at 685. Finally, almost any prosecutor,

**3.** *AFGE, Local 1533 v. Cheney,* 944 F.2d 503 (9th Cir.1991). Cf. *Harmon v. Thornburgh,* 878 F.2d 484, 493 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).

**4.** *International Brotherhood of Teamsters v. DOT,* 932 F.2d 1292 (9th Cir.1991).

**5.** *IBEW, Local 1245 v. Skinner,* 913 F.2d 1454 (9th Cir.1990).

**6.** *Bluestein v. Skinner,* 908 F.2d 451 (9th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991).

**7.** *Harmon,* 878 F.2d at 492.

**8.** *Taylor v. O'Grady,* 888 F.2d 1189 (7th Cir. 1988).

**9.** *Dimeo v. Griffin,* 943 F.2d 679 (7th Cir.1991) (en banc).

**10.** *Department of the Navy v. Egan,* 484 U.S. 518, 527–28, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988).

**11.** *Von Raab,* 489 U.S. at 678, 109 S.Ct. at 1397; *Harmon,* 878 F.2d at 492–93.

clerk or manager could engage in a drug induced disturbance of the Department of Justice. *But cf. Harmon,* 878 F.2d at 492–93. Other courts have at least implicitly rejected those kinds of scenarios. Yet it is just that kind of possibility that the NRC, in its earnest desire to cast its testing net as widely as possible, has argued as justification for the testing of clerical workers at Diablo Canyon. I do not agree that so ephemeral an argument is justification enough.

In a similar vein, the NRC says that if a disaster does occur, some clerical workers may have some tasks to perform that are of importance because they would "staff" the emergency response center, whatever that means. It seems to me that it does not mean enough to require that all of the clerical workers be subjected to testing at all times.

For these reasons, I cannot agree with that portion of the majority opinion which finds merit in the reasons the NRC gives for its desire to test all clerical workers, and I must add my sough to the jeremiads of others who have watched developments in this area with dismay. *See, e.g., Von Raab,* 489 U.S. at 680–87, 109 S.Ct. at 1398–1402 (Scalia, J., dissenting); *Dimeo,* 943 F.2d at 686 (Wood, J., dissenting).

Having said all of this I, nevertheless, concur in the opinion of the majority for rather mundane but still weighty reasons.

On the record before this court, it is not possible to ascertain whether many clerical workers truly do hold positions which would make testing appropriate. Merely labeling people as clerical workers does not lead to an obvious result. *See IBEW, Local 1245,* 913 F.2d at 1462. Had petitioner presented its case to the NRC in such a way as to allow the making of the necessary discriminations among workers and classifications, I would be more prepared to strike down the portions of the regulations which do sweep too broadly. I suspect that would be a significant portion. As the record stands, it would be quite impossible to shape a proper order. No doubt, the failure of the petitioner to be more specific was driven by its zealous desire to protect all of its members. In so doing, however, it has committed an error akin to the error it ascribes to the NRC—it has tried to accomplish too much.[12]

Thus, given the state of the record before us, the majority's determination that we must uphold the determination of the NRC that it should do nothing regarding the clerical workers at this time is surely correct. The same, incidentally, is true of the warehouse workers, although on this record it is even less clear that they are entitled to relief.

In sum, I am unable to accept the NRC's argument that its reasons for including all clerical workers in its testing regulation are sufficient. They are not. The same may well be true as to some of the warehouse workers. On the other hand, the petitioner's presentation of its case to the NRC was so unfocused that it is impossible to separate categories of workers who should not be covered from categories of those who should be.

Therefore, I do not agree with the portion of the majority's discussion which allows the NRC to use a net with mesh so fine that it will catch many who should be allowed to pass through and go free. However, given the state of this record, I concur.

12. Indeed, IBEW's purported "exemption request" was in effect an attack on the random drug testing requirement itself. The bulk of IBEW's argument was that random drug testing was unnecessary at Diablo Canyon because the facility had an excellent safety record, the previous policy of administering drug tests for cause was adequate, and there was no evidence of drug use at Diablo Canyon. These general claims demonstrate IBEW's conviction that the requirement of random drug testing was fundamentally misconceived. Yet a broad-based attack on the very premises of the drug testing rule would be more appropriate in a petition for rulemaking. *See* 10 C.F.R. § 2.802. The claim regarding categories of workers was similarly general. To challenge the drug testing rule as applied to particular types of workers, the IBEW must make a factual showing narrowly tailored to those workers.